IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HIRTLE CALLAGHAN HOLDINGS, | : | |
| ET AL., | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 18-2322 |
| CURT R. THOMPSON, ET AL. | : | |

**MEMORANDUM**

**SURRICK, J.**                                                            **SEPTEMBER 30**, **2020**

Presently before the Court is Plaintiffs' Motion to Dismiss Defendant Curt R.

Thompson's Counterclaims.  (ECF No. 6.)  For the following reasons, Plaintiff's Motion will be

granted in part and denied in part.

**I.       BACKGROUND**

In this breach-of-contract case, Plaintiffs Hirtle Callaghan Holdings Inc. and Hirtle,

Callaghan & Co., LLC (collectively "Hirtle") bring claims against one of its former employees—

Defendant Curt R. Thompson—for breach of contract and misappropriation of trade secrets.[1]

(ECF No. 1.)  Plaintiffs allege that after he resigned from Hirtle, Mr. Thompson solicited Hirtle

customers for a competing business in violation of covenants contained in stock purchase

agreements he executed with Hirtle.  Plaintiffs also seek a permanent injunction against Mr.

Thompson and a declaratory judgment that Hirtle need not provide compensation to Mr.

Thompson for stock they allege he forfeited as a result of his breach of contract.

---

[1] Plaintiffs also brought claims against (1) Global Strategic Investment Solutions, LLC ("GSIS), the company that employed Mr. Thompson after he left Hirtle; (2) Mr. Thompson's wife, Lisa M. Thompson, in her position as co-trustee of the CLT Family Trust; and (3) the CLT Family Trust.

Mr. Thompson alleges various counterclaims against Plaintiffs.  Specifically, he asserts: (1) breach of contract; (2) promissory estoppel; (3) breach of fiduciary duty; (4) violation of the Pennsylvania Wage Payment and Collection Law (WPCL), 43 P.S. §§ 260.1 *et seq.*; (5) violation of the Delaware Wage Payment and Collection Act (WPCA), 19 Del. C. §§ 1101 *et seq.*; (6) violation of Arizona wage laws, A.R.S. §§ 23-350 *et seq.*; and (7) declaratory relief. (Counterclaims, ECF No. 4.)  In support of these counterclaims, Mr. Thompson alleges the following:

Hirtle Callaghan is a Delaware limited liability company with its principal place of business in Pennsylvania.  Hirtle Callaghan Holdings is a Delaware corporation.  It has the same principal place of business as Hirtle Callaghan.  Hirtle Callaghan Holdings is also the parent company and majority member of Hirtle Callaghan.  (Counterclaim ¶¶ 4-6.)  Collectively, Hirtle is comprised of an outsourced chief investment officer and investment advisory firm.  (*Id.* ¶ 9.) Curt Thompson, an Arizona resident, was a long-time employee of Hirtle, where he served as an investment officer.  (*Id.* ¶¶ 3, 10.)  In 2000, Mr. Thompson was promoted to principal and became a partner in Hirtle.  He is also a minority member of Hirtle Callaghan.  (*Id.* ¶¶ 11-12.)

In 2001, Hirtle asked Mr. Thompson to move from the Philadelphia area to Scottsdale, Arizona to lead Hirtle's new regional office there.  In consideration for the move, Hirtle awarded Mr. Thompson 5,050 shares of Hirtle stock, which have since fully vested.  (*Id.* ¶¶ 13-14.)  At the time, Mr. Thompson's compensation at Hirtle was 30% of the revenue the company received under his management.  In 2006, Hirtle reduced Mr. Thompson's compensation to 25% of revenue, but explained that this change was not a "pay cut" and that it would make up the difference in cash wages by awarding Mr. Thompson additional equity in Hirtle.  (*Id.* ¶¶ 15-17.) On September 29, 2006, Hirtle awarded Mr. Thompson an additional 4,659 shares of stock in

Hirtle, pursuant to a Stock Award Agreement dated September 29, 2006.  (*Id*. ¶ 18 & Ex. A.)
These additional shares fully vested on September 30, 2010, at which point Mr. Thompson held a
total of 9,719 shares of Hirtle stock.  (*Id*. ¶¶ 19-20.)

From the time all of these shares were awarded to Mr. Thompson to the time at which
they vested, Hirtle's valuation formula for its stock was 3.5 times Hirtle's revenue (the "Original
Valuation Mechanism").  The Original Valuation Mechanism had been in place since 1988,
when the company was formed, and it was the only valuation mechanism utilized for all shares
awarded to employees.  As such, Mr. Thompson relied on this valuation mechanism when Hirtle
reduced his cash compensation in exchange for the additional equity, which Hirtle agreed would
be valued in accordance with the Original Valuation Mechanism.  (*Id*. ¶¶ 21-22.)

In 2010, Hirtle reduced Mr. Thompson's cash compensation to 16% of revenue, with the
possibility of a 4% bonus, depending on various factors.  In connection with this compensation
change, Hirtle promised Mr. Thompson that he would receive additional equity in the company,
subject to the Original Valuation Mechanism.  (*Id*. ¶ 23.)  In 2011 and beyond, Mr. Thompson
was offered additional shares in Hirtle, but he was given the option to accept the shares as is or
receive their cash value, based on the Original Valuation Mechanism.  Mr. Thompson opted for
the cash value, which was paid in accordance with the Original Valuation Mechanism.  In 2016,
Mr. Thompson redeemed 246 of his shares at $294.14 per share, also in accordance with the
Original Valuation Mechanism.  (*Id*. ¶¶ 24-26.)

In March 2017, Mr. Thompson learned that Hirtle had retroactively reduced the value of
his remaining vested shares.  When he inquired as to the reason for the change, Hirtle advised
Mr. Thompson that it had decided to change the Original Valuation Mechanism.  The New
Valuation Mechanism allowed Hirtle to manipulate its stock value, which ultimately meant a

significant reduction in the value of Mr. Thompson's shares. Mr. Thompson asked for a written version of the New Valuation Mechanism, but Hirtle refused to provide it to him. (*Id.* ¶¶ 27-31.)

Later in 2017, Mr. Thompson redeemed an additional 301 shares at a reduced price of $195.01 per share (the "2017 Redeemed Shares"). Mr. Thompson currently holds 9,162 shares of Hirtle stock (collectively the "Thompson Shares"). He paid income taxes on the shares he earned as compensation, and the taxes were based on the Original Valuation Mechanism. (*Id.* ¶¶ 32-35.)

In December 2017, Mr. Thompson notified Hirtle that he was resigning. On January 4, 2018, he began employment with GSIS, a registered investment advisor. GSIS was founded by Donald Callaghan ("Callaghan"), who was a founding member of Hirtle, but departed Hirtle years before. (*Id.* ¶¶ 36-39.) On January 29, 2018, Hirtle sent a letter to Mr. Thompson, advising that Mr. Thompson's new colleague, Mr. Callghan, had contacted Hirtle customers, thus indicating that Mr. Thompson violated certain non-solicitation and confidentiality agreements between him and Hirtle. The letter also advised Mr. Thompson that if the solicitations did not cease, Hirtle would deem his outstanding shares in Hirtle forfeited. (*Id.* ¶ 41 & Ex. B.) Mr. Callaghan is not bound by any restrictive covenants in favor of Hirtle, and Mr. Thompson is not prohibited from working for a competitor of Hirtle. (*Id.* ¶¶ 39, 40, 43.)

## II.    DISCUSSION

### A.    Standard of Review

Plaintiffs move to dismiss Mr. Thompson's Counterclaims pursuant to Rule 12(b)(6), for failure to state a claim. On a 12(b)(6) motion, "courts 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Eid v.*

*Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. Cnty. Of Allegheny*, 515 F.3d

223, 233 (3d Cir. 2008)).  "In order to defeat a Rule 12(b)(6) motion, plaintiffs' '[f]actual

allegations must be enough to raise a right to relief above the speculative level….'"  *Id.* (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "Thus, 'only a complaint that states a

plausible claim for relief survives a motion to dismiss'" under Rule 12(b)(6).  *Id.* (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

"In reviewing [a] motion to dismiss, we may also consider exhibits attached to and

incorporated into the complaint."  *Estate of Gleiberman v. Hartford Life Ins. Co.*, 94 F. App'x

944, 946 (3d Cir. 2004) (citing *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994)).

"Where there is a disparity between a written instrument annexed to a pleading and an allegation

in the pleading based thereon, the written instrument will control."  *ALA, Inc*, 29 F.3d at 859 n.8.

### B.    Mr. Thompson Fails to State a Claim for Breach of Contract or Breach of the Implied Covenant of Good Faith and Fair Dealing

Mr. Thompson's claim for breach of contract is based on the September 29, 2006 Stock

Award Agreement, which contains a Delaware choice-of-law provision.  (*See* Counterclaim ¶¶

48-54 & Ex. A at ¶ 14(d).)  Mr. Thompson asserts that "Hirtle's unilateral change in the

valuation of the 2017 Redeemed Shares and the Thompson Shares in the Spring of 2017

substantially diluted and decreased the value of the Thompson Shares, and constitutes a breach

of the Stock Award Agreement."  (*Id.* ¶ 50.)  Mr. Thompson also alleges that Hirtle's unilateral

change to the stock valuation mechanism is a breach of the implied covenant of good faith and

fair dealing.  (*Id.* ¶ 52).

An implied covenant of good faith and fair dealing "attaches to every contract."  *Dunlap*

*v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (citation omitted).  "The covenant

is 'best understood as a way of implying terms in the agreement,' whether employed to analyze

unanticipated developments or to fill gaps in the contract's provisions." *Id.* at 441 (internal citations omitted) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)). "Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty . . . unattached to the underlying legal document." *Id.* (internal citations omitted) (quoting *Glenfed Fin. Corp., Commercial Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994)). "Thus, one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." *Id.* (citation omitted).

"Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Id.* at 442 (internal quotations omitted); *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010)). "Thus, parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap*, 878 A.2d at 442 (quoting *Breakaway Solutions, Inc. v. Morgan Stanley & Co. Inc.*, No. 19522, 2004 WL 1949300, at *12 (Del. Ch. Aug. 27, 2004)).

"Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract. Rather the covenant is a limited and extraordinary legal remedy." *Nemec*, 991 A.2d at 1128. The Delaware Supreme Court "has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties' reasonable expectations." *Cincinnati SMSA Ltd. P'ship v. Cincinatti Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998); *see also Dunlap*, 878 A.2d at 442 (citing *Pressman*, 679

A.2d at 443; *Cincinatti SMSA*, 708 A.2d at 992).  "This quasi-reformation, however, 'should be [a] rare and fact-intensive' exercise," which is "governed solely by 'issues of compelling fairness.'"  *Dunlap*, 878 A.2d at 442 (quoting *Cincinnati SMSA*, 708 A.2d at 992; *Wilmington Trust Co. v. Keith*, 2002 WL 1748622, at *2 (Del. Super. Ct. June 26, 2002)).  "Only when it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter' may a party invoke the covenant's protections."  *Id*. (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

      In light of that background, we turn to the pleading standards for contract and implied covenant claims.  "[T]o state a breach of contract claim under Delaware law, [a claimant] must plead (1) the existence of a contract, (2) the breach of a contractual obligation, and (3) a resultant damage."  *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267 (3d Cir. 2016) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).  To state a claim for breach of the implied covenant, the plaintiff "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damages to the plaintiff."  *In re Tropicana Entm't, LLC*, 520 B.R. 455, 474 (D. Del. 2014) (quoting *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009)); *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581-82 (D. Del. 2007).

      In *Anderson*, the plaintiffs entered into a contract to purchase three residential properties. Under the contract of sale, if any of the three properties was not purchased, the plaintiffs would lose their entire $40,000 deposit on the properties.  *Id*. at 575.  The plaintiffs entered into separate agreements with Wachovia to obtain financing for the properties.  According to the plaintiffs, Wachovia imposed numerous, unreasonable loan and closing conditions on the

plaintiffs, including multiple requests for appraisals, property improvements, and higher down payment and cash reserve requirements than expected. *Id*. at 575-77, 582 n.18. The plaintiffs alleged that Wachovia "created unreasonable loan conditions specifically designed to defeat [the] contract," by putting the plaintiffs in "the dilemma of either losing their deposit of $40,000.00 and the opportunity to purchase the homes that they chose to purchase or complying with the unreasonable requirements of the bank." *Id*. at 582.

The court dismissed plaintiffs' breach of contract claim, reasoning simply that the plaintiffs failed to "identif[y] any express contract provision that was breached." *Id*. at 581 (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006)). The court allowed the implied covenant claim to proceed, however, finding that Wachovia was "taking advantage of the fact that plaintiffs needed to buy all three houses in order to complete their deal (and) . . . erected unreasonable hurdles that plaintiffs were forced to clear before they could receive the mortgages for which they had contracted." *Id*. at 582.

Here, Mr. Thompson's contract claim is deficient for the same reason as in *Anderson*—he alleges the existence of a contract, but no specific contractual obligation that was breached. His general statement that Hirtle's change to its stock valuation methodology constituted a breach of the Stock Award Agreement does not suffice. Mr. Thompson must plead a specific contractual obligation that was breached.

The implied covenant claim, on the other hand, is not as straightforward. Mr. Thompson seems to allege that Hirtle breached an implied contractual obligation to use the Original Valuation Mechanism. However, that is not the end of the analysis. The lesson from *Anderson* is that an implied covenant claim is plausible if the defendant made it very difficult, if not impossible for the plaintiff to receive any benefit from the contract. Mr. Thompson's claim is a

bit different.  He alleges that because of Hirtle's actions, he received less than he had hoped for under the Stock Award Agreement.  In addition, the contract language is relevant to an implied covenant claim, *see Nemec*, 991 A.2d at 1128; *Dunlap*, 878 A.2d at 442, however we have difficulty ascertaining the contours of the Stock Award Agreement, and in particular, the Equity Incentive Plan referred to and incorporated by reference into the Stock Award Agreement.  (*See* Counterclaim Ex. A at 1.)  Based on a plain reading of the Stock Award Agreement, it appears that the Equity Incentive Plan may govern the valuation of Hirtle's stock.  (*See id*. Ex. A ¶ 3) ("The Corporation hereby grants to the Award Recipient 4,659 shares of the nonvoting common stock, par value $.001 per share, of the Corporation … *pursuant to the provisions of the Plan . . . .*") (emphasis added).  However, we cannot be sure, especially because Mr. Thompson did not attach the Plan to his Counterclaims or otherwise make any specific allegations about the Plan. Without this information, we cannot determine whether Hirtle's alleged change to the stock valuation methodology was arbitrary or unreasonable, or defeated the overarching purpose of the Stock Award Agreement.

As the Counterclaimant, Mr. Thompson bears the burden of setting forth a viable claim and attaching the relevant documents to his pleadings.  We are not convinced that he has done so here.  Accordingly, Mr. Thompson's claims for breach of contract and breach of the implied covenant of good faith and fair dealing (Count I) will be dismissed without prejudice.  We note that Mr. Thompson should not assume that his contract and implied covenant claims will be sufficient as long as he attaches the Plan to an amending pleading.  He must still allege specific contractual and implied contractual obligations that he believes were breached, and otherwise satisfy the relevant standards under *Nemec* and *Dunlap*.

### C.     Mr. Thompson's Claim for Promissory Estoppel Will Be Permitted to Proceed

"The doctrine of promissory estoppel allows a party, under certain circumstances, to enforce a promise even though that promise is not supported by consideration." *Cornell Cos., Inc. v. Bor. of New Morgan*, 512 F. Supp. 2d 238, 266 (E.D. Pa. 2007) (quoting *Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1006 (Pa. Super. 1997)).  To state a claim for promissory estoppel, "a plaintiff must allege the following: '1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.'" *Id*. (quoting *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000)).

Hirtle does not argue that Mr. Thompson fails to allege these elements.  Rather, it argues that the existence of the Stock Award Agreement precludes a promissory estoppel claim. Generally, "'an enforceable contract between two parties precludes relief for a claim of promissory estoppel.'" *West Chester Univ. Foundation v. MetLife Ins. Co. of Connecticut*, 259 F. Supp. 3d 211, 222 (E.D. Pa. 2017) (quoting *Isobunkers, L.L.C. v. Easton Coach Co.*, No. 09-879, 2010 WL 547518, at *4 (E.D. Pa. Feb. 9, 2010)); *see also Carlson v. Arnot-Ogden Mem'l. Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) ("In light of our finding that the parties formed an enforceable contract, relief under a promissory estoppel claim is unwarranted.").  "Additionally, promissory estoppel claims should not be used to modify an enforceable contract." *Isobunkers*, 2010 WL 547518, at *4 (citing *Tomlinson v. Checkpoint Sys., Inc.*, No. 06-2205, 2008 WL 219217, at *6 (E.D. Pa. Jan. 25, 2008)).

Although there is an enforceable contract between the parties, "a plaintiff can plead in the alternative and a promissory estoppel claim is a permissible alternative cause of action to a

breach of contract claim." *Cornell Cos.*, 512 F. Supp. 2d at 266 n.19.  Furthermore, as we explain above, we do not know the contours and scope of the Stock Award Agreement. Similarly, we cannot determine whether the promises Mr. Thompson alleges regarding the Original Valuation Mechanism conflict with the Stock Award Agreement, or the legal ramifications of any such conflict.  *See Orthovita, Inc. v. Erbe*, No. 07-2395, 2008 WL 423446, at \*14 (E.D. Pa. Feb. 14, 2008) ("Because it is permissible to plead breach of contract and promissory estoppel in the alternative, and it is not yet ascertainable whether the parties agree on the scope of the employment contract or the contours of the parties' dispute, the promissory estoppel claim survives dismissal."); *but see Synesiou v. DesignToMarket, Inc.*, No. 01-5358, 2002 WL 501494, at \*5 (E.D. Pa. Apr. 3, 2002) (rejecting argument that relevant promises were beyond the scope of the subject agreement and dismissing promissory estoppel claims under Rule 12(b)(6)).

At this juncture, we will deny Plaintiffs' Motion to Dismiss as to Count II of the Counterclaims.  We may revisit this issue in connection with any subsequent dispositive motions.

### D.    Mr. Thompson's Claim for Breach of Fiduciary Duty May Proceed Only as to Hirtle Callaghan Holdings

Plaintiffs assert that Mr. Thompson fails to allege any fiduciary duty owed by Hirtle Callaghan.  Mr. Thompson's response is that he is alleging a breach of fiduciary duty only against Hirtle Callaghan Holdings, and he "has not asserted any claim for breach of fiduciary duty against [Hirtle Callaghan]."  (Def. Br. 14, ECF No. 7.)[2]   The parties are in agreement.  To

---

[2] The title of Count III suggests otherwise.  (*See* Counterclaims at 19) ("Breach of Fiduciary [] Curt Thompson v. Hirtle Callaghan Holdings **and Hirtle Callaghan**") (emphasis added).

the extent Mr. Thompson's Counterclaims assert a breach of fiduciary duty against Hirtle

Callaghan, that claim is dismissed.  Mr. Thompson's fiduciary duty claim against Hirtle

Callaghan Holdings may proceed.

      **E.**      **Mr. Thompson Fails to State a Claim under the Pennsylvania WPCL**

Under Pennsylvania law, "[t]he WPCL does not create a right to compensation; it

provides a statutory remedy when the employer breaches a contractual obligation to pay earned

wages." *Oxner v. Cliveden Nursing & Rehabilitation Ctr. PA, L.P.*, 132 F. Supp. 3d 645, 649

(E.D. Pa. 2015) (citing *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003)); *see

also Killian v. McCulloch*, 850 F. Supp. 1239, 1255 (E.D. Pa. 1994) ("The purpose of the WPCL

is to allow employees to recover wages and other benefits that are due from employers pursuant

to agreements between the parties.").  The statute does not apply when a plaintiff fails to "show[]

that [the defendant] breached a contractual obligation to pay him earned wages." *See Sheils v.

Pfizer*, 156 F. App'x 446, 452 (3d Cir. 2005).  Accordingly, "a plaintiff seeking recovery under

the WPCL 'must allege a contractual right—either written or oral—to the claimed wages' in

order to survive a 12(b)(6) motion to dismiss." *Rosario v. First Student Mgmt. LLC*, No. 15-

6478, 2016 WL 4367019, at *7 (E.D. Pa. Aug. 16, 2016) (quoting *MacKereth v. Kooma, Inc.*,

No. 14-4824, 2015 WL 2337273, at *10 (E.D. Pa. May 2015)).

The critical allegation in support of Mr. Thompson's WPCL claim is that "Hirtle's

attempt to cause forfeiture of the Thompson Shares, and/or Hirtle's attempted retroactive dilution

and reduction in value of those shares and the 2017 Redeemed Shares, violate the Pennsylvania

WPCL." (Counterclaim ¶ 72.)  However, as in Mr. Thompson's claim for breach of contract,

Mr. Thompson does not allege any specific contractual right that was breached or that otherwise

entitles him to the Original Valuation of the shares.  Mr. Thompson's description of the alleged

forfeiture of his shares as "attempt[ed]" also casts doubt as to whether his claimed right to relief is anything more than speculative.[3]  *See Twombly*, 550 U.S. at 555.  Count IV of the Counterclaims is dismissed without prejudice.

### F.    Mr. Thompson Fails to State a Claim under the Delaware WPCA

"[T]he purpose of the Delaware Wage Payment and Collection Act is to provide a remedy for employees to recover regular direct recurrent wages unreasonably withheld by the employer."  *Gallagher v. E.I. DuPont De Nemours & Co.*, 2010 WL 1854131, at *6 (Del. Super. Apr. 30, 2010) (citing *Dep't of Labor ex rel. Commons v. Green Giant Co.*, 394 A.2d 753, 755 (Del. Super. 1978)).  To state a WPCA claim under Delaware law, a plaintiff must allege the following elements:  (1) that plaintiff was an employee of the employer; (2) that plaintiff was under a contract made in Delaware or to be performed in Delaware; (3) that plaintiff's wages were withheld; and (4) that there were no reasonable grounds to withhold the wages. *Nikolouzakis v. Exinda Corp.*, No. 11-1261, 2012 WL 3239853, at *12 (D. Del. Aug. 7, 2012) (citing 19 Del. C. § 1103).

Hirtle contends that Mr. Thompson's WPCA claim fails for three reasons: (1) he was not an employee under the WPCA; (2) the statute of limitations has expired; and (3) the disputed shares are not "wages" under the WPCA.  Turning to the first argument, the WPCA defines "employee" as "any person suffered or permitted to work by an employer under a contract of employment either made in Delaware or to be performed wholly or partly therein."  19 Del. C. § 1101(a)(3).  Based on the Stock Award Agreement and Mr. Thompson's allegations, especially

---

[3] In his Opposition to Plaintiffs' Motion to Dismiss, Mr. Thompson asserts that Hirtle did in fact deem his shares forfeited as of June 4, 2018.  (ECF No. 7 n.2.)  However, a claim "may not be amended by the briefs in opposition to a motion to dismiss."  *Commonwealth ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (quotations and citations omitted).

those regarding his residences in the Philadelphia area and Arizona, there is no indication that the Stock Award Agreement was intended to be performed in Delaware, either wholly or in part. Accordingly, Mr. Thompson is an "employee" under the WPCA only if the Stock Award Agreement was "made in Delaware." *See id*.

Notably, "incorporation in a particular state does not mean that all the corporation's contracts are made or performed in the incorporating state." *Nikolouzakis*, 2012 WL 3239853, at *12. Similarly, the fact that a contract contains a Delaware choice-of-law provision has no bearing on where the contract is made or performed. Without any clear guidance as to what constitutes the location of contracting under § 1101(a)(3), we turn to conflicts of laws principles, pursuant to which the place of contracting is "the place where . . . the last act [occurred, which was] necessary, under the forum's rules of offer and acceptance, to give the contract binding effect." *North Am. Philips Corp. v. Aetna Cas. & Sur. Co.*, 1994 WL 555399, at *2 (Del. Super. Ct. Sept. 2, 1994) (quoting Restatement (Second) of Conflict of Laws § 188 cmt. e). "Delaware does not have a specific rule which defines the last act necessary to form a binding [] contract." *Id*. Based on the Restatement (Second) of Conflict of Laws and *North American Philips*, however, we would expect Delaware courts to give weight to the location of execution and the last place of contract negotiation preceding execution. *See id*; Restatement (Second) of Conflict of Laws § 188 cmt. e.[4]

---

[4] There is a line of cases holding that whether an individual is an "employee" under the WPCA is a matter for the courts to decide on a case-by-case basis, based on various factors regarding the relationship between the employer and claimant. *See Kutney v. Saggese*, 2002 WL 1463092, at *1 (Del. Super. July 8, 2002) (citing *Fairfield Builders, Inc. v. Vattilana*, 304 A.2d 58, 60 (Del. 1973)). These cases, however, address the independent contractor-employee distinction, rather than the meaning of "employee" in the context § 1101(a)(3)'s "Delaware contract" clause.

14

Here, it appears that Mr. Thompson executed the Stock Award Agreement in Arizona. (*See* Counterclaim Ex. A at 8).  However, we do not know where Hirtle countersigned the contract or where the contract was negotiated.  Accordingly, Mr. Thompson has not established that he was an employee under the WPCA, i.e., that he worked pursuant to a "contract of employment either made in Delaware or to be performed wholly or partly therein."  *See* 19 Del. C. § 1101(a)(3).

Hirtle's next argument is based on the statute of limitations, which is one year for WPCA claims.  *See Phifer v. Sevenson Environmental Servs., Inc.*, 619 F. App'x 153, 157 n.6 (3d Cir. 2015) (citing 10 Del. C. § 8111).  Generally, "a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion," but "'an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading.'"  *McCracken v. Ford Motor Co.*, 588 F. Supp. 2d 635, 642 (E.D. Pa. 2008) (quoting *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994), *abrogated on other grounds by Rotkiske v. Klemm*, 890 F.3d 422, 428 (3d Cir. 2018)).

According to Hirtle, the claim accrued on March 31, 2017, when Mr. Thompson redeemed the 2017 Redeemed Shares at a lower price than that provided for by the Original Valuation Mechanism.  According to Mr. Thompson, the claim accrued in June 2018, when Hirtle deemed Mr. Thompson's shares forfeited.  *See* n.2, *supra*.  On the face of the Counterclaims, the Court is unable to rule out Mr. Thompson's proposed accrual date.  *Cf. Compass v. Am. Mirrex Corp.*, 72 F. Supp. 2d 462, 468 (D. Del. 1999) (even though the disputed bonus was due at a designated time under the employment agreement, the claim for payment of the bonus accrued when the defendant issued a check for less than the plaintiff believed he was

owed under the agreement, even though that occurred after the designated payment date). Accordingly, we will not decide the statute of limitations issue at this time.

Finally, Hirtle contends that Mr. Thompson's shares are not "wages" under the WPCA. "Wages," for purposes of the WPCA, "means compensation for labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation." 19 Del. C. § 1101(a)(5). We note that there is an apparent tension between this broad definition of wages in the statute and the line of cases regarding wages as "regular direct compensation which would ordinarily be paid at the end of each pay period of a certain number of work days." *See Compass*, 72 F. Supp. 2d at 469 (quoting *Green Giant*, 394 A.2d at 755 ("The usage in the statute does not adapt itself to the concept that 'wages' include nonrecurrent benefits such as severance pay.")); *but see SCOA Indus., Inc. v. Bracken*, 374 A.2d 263, 264 (Del. 1977) (year-end bonus constituted wage under WPCA); *Seitz v. Siegfried Grp., LLP*, 2001 WL 1198941, at *4 (Del. Super. Oct. 2, 2001) ("Clearly this [statutory] definition of wages does not limit wages to those amounts included in an employee's normal paycheck."). We are not aware of any Delaware cases holding that equity is a type of wage under § 1101(a)(5). Nevertheless, we believe that the broad language in the statute allows any type of compensation to be treated as a wage, as long as the compensation is for "services rendered" by the plaintiff. *See* 19 Del. C. § 1101(a)(5); *Seitz*, 2001 WL 1198941, at *4.

In his Counterclaims, Mr. Thompson alleges that at least some of the equity he received from Hirtle was given to him as compensation in lieu of "cash wages," which Hirtle had reduced. (*See* Counterclaims ¶¶ 16-18.) On a motion to dismiss, we need not conclude that *all* of Mr. Thompson's shares in Hirtle are wages under the WPCA. Accordingly, we conclude that Mr.

Thompson has sufficiently alleged the "wages" component of a WPCL claim for purposes of Rule 12(b)(6).

To summarize, we will deny Hirtle's Motion with respect to its statute of limitation and wage definition arguments. We will grant Hirtle's Motion with respect to Mr. Thompson's status as an "employee" under the WPCA. Count V of the Counterclaims will be dismissed without prejudice.

### G.    Mr. Thompson States a Claim under Arizona's Wage Laws

Hirtle moves to dismiss Mr. Thompson's Arizona wage law claim, asserting that he failed to comply with the applicable statute of limitations and that his shares in Hirtle are not "wages" under the relevant statute. For reasons similar to those outlined in the previous section, we reject these arguments.

A.R.S. § 23-355 states in part that if an employer "fails to pay wages due any employee, the employee may recover in a civil action against an employer or former employer an amount that is treble the amount of the unpaid wages." A one-year statute of limitation applies to a claim for unpaid wages made pursuant to this section. *See Redhair v. Kinerk, Beal, Schmidt, Dyer & Sethi, P.C.*, 183 P.3d 544, 550 (Ariz. App. 2008) (citing *McKinley v. Town of Fredonia*, 680 P.2d 1250, 1251 (Ariz. App. 1984)). As indicated above, we are unable to decide the statute of limitations issue at this time.

With regard to Hirtle's other argument, "wages" under A.R.S. § 23-350 are "nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by a time, task, piece, commission or other method of calculation." Like its Delaware counterpart, this section defines wages broadly and does not appear to exclude equity. *See also Holm v.*

*Gateway Anesthesia Assocs. PLLC*, No. 16-0673, 2018 WL 770503, at *12 (Ariz. App. Feb. 8, 2018) (finding court did not abuse its discretion by regarding partnership profits as "wages" under § 23-350 where defendant agreed to pay plaintiffs as if they were partners and profit shares were compensation plaintiffs "reasonably expected in return for their services").  Unlike its Delaware counterpart, however, the statute includes the phrase "nondiscretionary compensation," which neither side has explained in connection with this Motion.  Regardless, the question here is whether Mr. Thompson has set forth a plausible claim for unpaid wages under Arizona law.  Although the parties may eventually wish to address the relevant evidentiary burdens and intricacies of § 23-350, we decline to do so and conclude only that Mr. Thompson has plausibly stated a wage claim under Arizona law.

### H.      Mr. Thompson May Proceed on His Claim for Declaratory Relief

Without citing to any case law or providing any explanation, Hirtle argues that Mr. Thompson's declaratory judgment claim should be dismissed because it "does not clearly state which substantive cause of action it relates to."  (Pl. Br. at 14, ECF No. 6-1).  Hirtle also asserts that to the extent the declaratory judgment claim "relates to the breach of contract claim in Count I," it should be dismissed along with the contract claim.  (*See id*.).  We are not persuaded by these conclusory arguments.  We do, however, consider whether a declaratory judgment claim is appropriate in this case.

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "The purpose of the Declaratory Judgment Act is to provide useful judgments that clarify legal relationships so that

parties 'make responsible decisions about the future.'"  *Market Street Secs., Inc. v. NASDAQ OMX PHLX LLC*, 900 F. Supp. 2d 529, 534 (E.D. Pa. 2012) (quoting *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 649 (3d Cir. 1990)); *see also Lehigh Coal & Nav. Co. v. Central R. of New Jersey*, 33 F. Supp. 362, 365 (E.D. Pa. 1940) ("Construction and interpretation of written instruments (including contracts, insurance policies, statutes, ordinances, wills, and trusts) is the principle function of a declaratory judgment proceeding.").  Although "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate," *see* Fed. R. Civ. P. 57, the Third Circuit allows courts "to exercise their discretion to decline proceeding with declaratory judgments when they duplicate other claims." *Butta v. GEICO Cas. Co.*, 400 F. Supp. 3d 225, 231 (E.D. Pa. 2019) (citing *State Auto Ins. Cos. v. Summy*, 234 F.3d 131, 134 (3d Cir. 2000)); *see also Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 421 (E.D. Pa. 2016) ("[J]udges in this district [have] applied [*Summy*] to bar duplicative claims in the same cause of action.") (collecting cases).

In his claim for declaratory relief (Count VII), Mr. Thompson seeks a judgment declaring that:

> (i) Curt Thompson is a member of Hirtle Callaghan; (ii) the Thompson Shares are vested, current and valid shares belonging to Curt Thompson; (iii) the value of the Thompson Shares and the 2017 Redeemed Shares must be computed using the Original Valuation Mechanism; (iv) within 10 days of the date of a judgment rendered by the Court or a jury in this action, Hirtle must redeem the Thompson Shares at a value equal to that computed under the Original Valuation Mechanism; (v) within 10 days of the date of a judgment rendered by the Court or a jury in this action Hirtle must pay Curt Thompson the difference between the price paid to Curt Thompson for the 2017 Redeemed Shares and the value computed under the Original Valuation Mechanism; and (vi) such other relief as the Court deems just and appropriate.

(Counterclaims at 23-24.)  Although there are some redundancies among this claim and Mr. Thompson's other claims, this is not a case where the claimant alleges in one count that he seeks

to "recover X," and in another count for declaratory relief that he seeks a "declaration that he is entitled to recover X." For example, Count VII is the first and only place in the Counterclaims where Mr. Thompson seeks a judicial determination that he is a member of Hirtle Callaghan. In addition, in Counts IV through VI, Mr. Thompson seeks civil penalties and attorney's fees under the various states' wage laws. The declaratory relief claim is not duplicative of those state-law-specific claims. Finally, even if Count VII were duplicative of Mr. Thompson's other claims, at least some of Mr. Thompson's Counterclaims will be permitted to proceed, so any "judicial economy" realized from declining to entertain Mr. Thompson's declaratory judgment claim would be minimal. *See Butta*, 2019 WL 4280492, at *4.

For these reasons, the Court will not dismiss Count VII of the Counterclaims.

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Dismiss Defendant Curt R. Thompson's Counterclaims is granted in part and denied in part. Mr. Thompson will be afforded an opportunity to amend his Counterclaims, consistent with this Memorandum.

An appropriate Order follows.

BY THE COURT:


*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**
